Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 0336 | **DATE** | May 17, 2004 |
| **CASE TITLE** | *SEC v. Hollinger International, Inc.* | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum and Order, this Court vacates the section of its March 1, 2004, Memorandum and Order granting the motion to vacate and DENIES Intervenor Hollinger Inc.'s motion to vacate the Consent Judgment.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | U.S. DISTRICT COURT CLERK | MAY 19 2004 date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | 57 |
| | Copy to judge/magistrate judge. | 2004 MAY 19 AM 7:31 | | |
| | | | date mailed notice | |
| RTS | courtroom deputy's initials | FILED Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SECURITIES AND EXCHANGE )
COMMISSION, )
 )
        Plaintiff, )
 )    Hon. Blanche M. Manning
v. )
 )    Case No. 04 C 0336
 )
HOLLINGER INTERNATIONAL, INC. )
 )
        Defendant. )

DOCKETED MAY 1 9 2004

## MEMORANDUM AND ORDER

Plaintiff Securities and Exchange Commission ("the SEC") brought the instant enforcement action for injunctive and other equitable relief against Hollinger International, Inc. ("International"), alleging violations of federal securities laws. After entry of a consent judgment granting a final partial judgment ("the Consent Judgment"), Hollinger, Inc. ("Inc."), the controlling shareholder of International, moved to intervene and to vacate the Consent Judgment.

On March 1, 2004, this Court entered a Memorandum and Order ("the March Order") [Docket No. 30-1], granting the motion to intervene and vacating the section of the Consent Judgment, which "could" affect Inc.'s voting rights as the controlling shareholder of International. The Court, however, stayed the entry of the March Order so that the parties could brief two dispositive issues: (1) "if, and to what extent," a recent ruling in Delaware Chancery Court ("the Delaware Decision"), Hollinger International, Inc. v. Black, et al., 844 A.2d 1022 (Del. Ch. 2004), has on this action; and (2) whether the actions of Inc. "warrant the impediments

51

imposed on [its] voting rights" by the Consent Judgment. After carefully reviewing the parties' supplemental briefs, this Court, for the reasons set forth below, finds that, based on the Delaware Decision, any impediments imposed on Inc.'s voting rights are incidental, do not violate Delaware law, and are warranted by the actions of Inc. and Conrad Black, the ultimate controlling shareholder of International and Inc., to protect the interests of the non-controlling shareholders. As a result, this Court vacates the section of March Order granting the motion to vacate and DENIES Inc.'s motion to vacate the Consent Judgment.[1]

## BACKGROUND[2]

This action stems from a corporate dispute between International and Inc. which led to violations of federal securities laws.[3] Although a publicly traded company, International is controlled by Inc. which owns 30.3% of its equity and 72.8% of its voting rights. In turn, Inc. is controlled by Conrad Black, International's former CEO and chairman, through a web of inter-related entities.

The SEC alleges that from 1999 until at least 2001, International improperly transferred at least $32 million to corporate insiders and related entities, including Inc. and Black. In an attempt to hide these transactions, International made false statements and failed to disclose material information in violation of the Securities Exchange Act of 1934 and SEC rules.

---

[1] The section of the March Order granting Inc.'s motion to intervene will stand.

[2] The facts in the Background section are derived from the SEC's complaint and Emergency Motion, the Delaware Decision, which, as explained below, applies to this action based on the doctrine of collateral estoppel, and the parties' submissions and attachments thereto. Further facts are set forth below in the discussion of the Delaware Decision.

[3] International, a publicly traded corporation incorporated in Delaware, is one of the larger newspaper publishers in the world. Its publications include the Chicago Sun-Times, the Jerusalem Post, and the London Daily Telegraph.

In response to a complaint by a non-controlling shareholder, International's board of directors established a special committee of independent directors ("the Special Committee") to investigate and recover these unauthorized transfers. The Special Committee's investigation appeared to be successful in that International admitted to making $32.15 million in unauthorized payments to Inc., Black, and other related individuals and entities. In a November 2003 agreement (termed the "Restructuring Process"), Inc., Black, and the others, without admitting to any wrongdoing, agreed to repay International. Before the first repayment, however, the SEC alleges that Black began to make public statements indicating that he had done nothing wrong and might not be obligated to repay the alleged unauthorized transfers.[4]

On January 16, 2004, two days before the first repayment was scheduled, the SEC brought the instant action against International, alleging violations of federal securities laws and seeking injunctive and other equitable relief. On the same day that it filed this action, the SEC brought an emergency motion, alleging that "there have been growing indications that some of the very same [International] corporate insiders and related entities who improperly received corporate assets are attempting to thwart and obstruct the efforts of the Special Committee." Relying solely on the SEC's written submissions and presumably without being advised of the potential effect on Inc.'s interests, the emergency judge entered the Consent Judgment, which was attached to the Emergency Motion.

In the Consent Judgment, International admitted that it had violated securities laws and agreed to allow the Special Committee to continue its independent investigation. Additionally, in Section IV of the Consent Judgment, International agreed that in the event of certain

---

[4] As of February 26, 2004, neither Inc. nor Black have made the promised repayments as set forth in the Restructuring Process.

3

"Triggering Events," a "Special Monitor" would be appointed with a mandate "to protect the interests of the non-controlling shareholders." The Triggering Events included actions which Inc. and/or Black, as the controlling shareholder with the power to appoint or discharge International board members ("the Board"), could take to hinder the investigation of the Special Committee. These actions include: (1) discharging the Special Committee; (2) diminishing or limiting the powers of the Special Committee; (3) narrowing the scope of the investigation; (4) removing Special Committee members from the Board or as members of the Special Committee; (5) removing any directors or refusing to reappoint any current directors; (6) electing new board members without approval of 80% of the incumbent directors; or (7) adding any new members to the Special Committee, without the consent of all current committee members.

The Consent Judgment also provided that, upon appointment, the Special Monitor would be charged with preventing the dissipation of International's assets, investigating illegal acts by International or any of its current or former officers and directors, and prosecuting claims on behalf of International. The Special Monitor also would have the power to come before this Court and contest any actions by directors or officers of International which the Special Monitor believed not to be in the best interests of the non-controlling shareholders. The provisions relating to the Special Monitor, however, are limited, in that they are set to expire on June 1, 2004, at the conclusion of the Special Committee's investigation.

Ten days after the entry of the Consent Judgment, Inc. brought the present motion to intervene and to vacate. Inc. contends that the provision calling for the Special Monitor improperly restricts its voting rights as the controlling shareholder in violation of Delaware law. In response, the SEC and International assert that: (1) the Consent Judgment does not violate

4

Delaware law because it does not preclude International from exercising its right to vote; and (2) any impediments to Inc.'s voting rights are justified based on the improper actions of Inc. and Black and to protect the interests of the non-controlling shareholders.

After reviewing the parties' initial briefs, this Court found that: "the [Consent Judgment] could impede Inc.'s 'fundamental right' to vote to elect or remove International's directors." (March Order at 9.) Therefore, the Court concluded that:

> the SEC should have given Inc. notice and alerted [the emergency judge] to the possible adverse affect the [Consent] Judgment could have on Inc. Because the SEC failed to take the above actions, [the emergency judge] did not have a complete and accurate view of the facts surrounding the entry of the [Consent Judgment].

(Id. at 13.) The Court therefore held that the sections of the Consent Judgment which affect Inc.'s right to vote should be vacated. (Id.)

To ensure the status quo (e.g., preventing Inc. from changing the composition of the Board), however, the Court stayed the entry of the March Order to allow the parties to submit supplemental briefs on: (1) "if, and to what extent," the Delaware Decision affects this action; and (2) whether the actions of Inc. "warrant the impediments imposed on [its] voting rights" by the Consent Judgment. It is these two issues that the Court will now address.

5

**ANALYSIS**

After carefully reviewing the parties' supplemental briefs and the Delaware Decision, this Court finds that: (1) under the doctrine of collateral estoppel, the factual and legal findings of the Delaware Decision are applicable to this action; and (2) the Consent Judgment does not violate Delaware law and any impediments on Inc.'s voting rights are incidental and justified to protect the interests of the non-controlling shareholders from Inc. and Black.

**I.      Collateral Estoppel**

Although each side cites to different authority – the SEC and International to Delaware law and Inc. to a Seventh Circuit decision, the elements of collateral estoppel are not in dispute. Compare People Who Care v. Rockford Bd. of Educ., 68 F.3d 172, 178 (7th Cir. 1995), with E.B.R. Corp. v. PSL Air Lease Corp., 313 A.2d 893, 894-95 (Del. 1973). Nevertheless, under Illinois choice of law rules, which govern this action, "the collateral estoppel . . . effect of a judgment is determined by the law of the jurisdiction where the judgment was rendered." Painewebber, Inc. v. Ras, 767 F. Supp. 930, 932 (N.D. Ill. 1991). Facing a similar situation, the court in In re Transocean Tender Offer Sec. Lit., 427 F. Supp. 1211, 1215 (N.D. Ill. 1977), a federal securities action, applied Delaware law to determine if a prior Delaware state court decision collaterally estopped the losing party from relitigating issues decided in the prior action. Accordingly, this Court will look to Delaware law to determine the collateral estoppel effect of the Delaware Decision.

Under Delaware law, collateral estoppel precludes relitigation of issues which were actually litigated and decided in a prior action in a subsequent proceeding between the same parties. E.B.R. Corp., 313 A.2d at 894-95. Here, Inc. contends that the doctrine does not apply

6

because "the issues in this case are not the same as that involved in the prior action, the parties did not actually litigate them." According to Inc., the "validity of the Consent Judgment was not at issue" and any statements made by the Delaware court regarding the Consent Judgment were "not essential" to its decision.

After carefully reviewing the Delaware Decision, this Court finds that the following issues were actually litigated and essential to the Delaware court's decision: (1) the facts surrounding the entry of the Consent Judgment (e.g., whether Inc. and Black threaten to derail the Special Committee's investigation); and (2) whether the Consent Judgment violates Delaware law.

The Delaware court discussed the Consent Judgment in conjunction with the "Rights Plan." Hollinger Int'l, Inc., 844 A.2d at 1051-52. As explained below, the Board adopted the Rights Plan to prevent Black from usurping a corporate opportunity by selling his interest in Inc. in violation of his agreement to use his best efforts to effectuate a sale in the best interest of International, as agreed to in the "Strategic Process" and "Restructuring Proposal." Id. at 1050. The Rights Plan is essentially a "poison pill" which would have diluted the interest of any purchaser of Inc. in International, and thereby, making an unapproved sale unlikely.[5] Id.

The Delaware court found that the purpose of the Consent Judgment was to allow the Special Committee to complete its work without further interference from Black. Id. at 1051. The concern was that Black would disband the Special Committee by replacing International's board with persons loyal to him. Id. The court also noted that the Consent Judgment was

---

[5] A "poison pill" is a plan providing for the below market value distribution to common stockholders of preferred stock or stock rights consisting of redemption or conversion privileges. Its purpose is to deter hostile takeovers by making a takeover prohibitively expensive. Poison Pill Rights, 56 Geo. Wash. L. Rev. 373, 374-75 (1988).

narrowly drafted, as it would expire once the Special Committee completed its work, which is currently set for June 1, 2004.

The defendants (which included Inc. and Black) argued that the Rights Plan "working in concert with the Consent Judgment, precludes removal of the board and thereby disenfranchises Inc." in violation of Delaware law.[6] Id. at 1089. Rejecting this contention, the Delaware court held that neither the Consent Judgment nor the Rights Plan violated Delaware law because they did not "prohibit Inc. from electing a new board" and any "incidental burden on Inc.'s voting rights" was justified given the actions of Black (discussed in detail below).[7] Id. The court also noted that "neither the Rights Plan nor the Consent Order, by their own terms prohibit Inc. from electing a new board and any consequences attaching to such action are not one about which Inc. can equitably whine." Id.

Consequently, this Court finds that, while the Delaware court did not actually address whether the Consent Judgment was properly entered, the validity of the Consent Judgment, as it operated with the Rights Plan, was actually litigated and essential to the court's decision that International did not violate Delaware law in enacting the Rights Plan and the Consent Judgment. The Court will thus adopt the relevant legal and factual findings of the Delaware Decision, including the holding that the Consent Judgment does not violate Delaware law.

---

[6] In its briefs to the Delaware court, Inc. specifically argued that International was attempting to use the Rights Plan and the Consent Judgment to "wrest control" from Inc. by preventing it from asserting its voting rights in contravention of Delaware law. (See Ex. A of International's supplemental reply memorandum.)

[7] In coming to this decision, the court noted that Inc. was "charged with the knowledge of the misconduct by its agent Black." Id.

## II. The Delaware Decision

Having determined that Inc. is collaterally estopped from contesting the relevant findings of the Delaware Decision, the Court will now summarize the Delaware court's findings as they pertain to this action. After a three day trial and reviewing numerous depositions, nearly 1000 exhibits, and nearly 500 pages in briefs, the Delaware court issued a comprehensive and well-reasoned opinion finding that: (1) Black, whose testimony was "evasive and unreliable," controlled Inc. and his actions should be attributed to Inc.; (2) Black "persistently and seriously" breached his fiduciary duty to the non-controlling shareholders by engineering millions of dollars in improper non-compete payments, without Board approval, to himself, Inc., and other related entities; (3) to avoid governmental scrutiny of his improper conduct, Black entered into an agreement with International to repay the misappropriated money and to use his best efforts to sell part of International's holdings for the benefit of all shareholders; (4) Black, however, almost immediately breached these agreements when he attempted to usurp a corporate opportunity to benefit himself at the expense of the non-controlling shareholders; and (5) Black's improper conduct "threatens grave injury" to International.

Black controls International through his controlling interest in Inc., which controls 72.8% of the voting power in International. Id. at 1031. For years, Black was the chairman and CEO of International. Id. During this time, Black engineered millions of dollars in "non-compete" payments by International to himself, Inc., and other related entities. Id. at 1034. These payments were made without prior Board approval and constituted conversion of corporate assets because there were no threats or reasons to pay these persons and entities not to compete. Id.

9

In June of 2003, after one of International's non-controlling shareholders questioned the non-compete payments, the Board formed the Special Committee, made up of independent outside directors, to investigate the payments. Id. at 1034-35. By October of 2003, the Special Committee concluded that Black had orchestrated over $32 million in improper non-compete payments. Id. The Special Committee also determined that these payments were not disclosed or approved by the Board, despite the fact that the 2001 annual report stated they were properly approved by the Board. Id. at 1037.

Faced with discovery of his improper acts and fearful of a government investigation, Black "sued for peace" with the Special Committee. Id. at 1039. As a result, Black and the Special Committee entered into a "Restructuring Process," whereby Black, without admitting to any wrongdoing, agreed to: (1) repay the "non-compete" payments; (2) allow the continuation of the Special Committee's work until June 1, 2004; (3) use his best efforts to effectuate the sale of some of Inc.'s assets, in a way which would benefit all of International's shareholders (termed the "Strategic Process"); (4) step down as CEO (but remain chairman); and (5) ensure an independent Board. Id. at 1041-44.

Soon after agreeing to the Restructuring Process, however, Black began to violate its terms. Id. at 1044-45. Under the Strategic Process, International engaged an investment banking company to valuate and search for purchasers of some of International's assets, including the London Daily Telegraph ("the Telegraph"), an English newspaper. Id. Unbeknown to the Special Committee, Black immediately began to do "an end-run around the Strategic Process." Id. at 1045. Black entered into secret negotiations for the sale of Inc. to the Barclays (an English media company). The Barclays hoped to gain control of the Telegraph by

purchasing Inc. and thereby acquire control of International. In attempting to facilitate this purchase, Black used confidential information to his own advantage. In exchange for selling Inc.'s interest in International (at the low end of the value determined by the investment bankers), Black would receive a $10 million severance package for himself. Id. at 1046. Based on these actions, the Delaware court found that Black had breached his fiduciary and contractual duties by trying to sell the Telegraph at a reduced price in exchange for the severance payment. Id. at 1029.[8]

The court also found that Black "began steps to repudiate his commitment to repay the [non-compete payments] due . . . under the Restructuring Proposal." Id. at 1049. In fact, on December 31, 2003, Black breached the agreement when he did not make his scheduled repayment. Id. The court also noted that all the other individuals and entities which had received the non-compete payments, except Black and Inc., had made the promised repayments. Id.

After learning that Black was attempting to sell the Telegraph indirectly (thereby usurping a corporate opportunity), the Board considered passing a "Rights Plan," which would put a "poison pill" in place to dissuade the Barclays from its proposed purchase. Id. at 1050. Upon learning of the proposed Rights Plan, Black threatened to remove the Board and/or sue the directors on the Special Committee. In fact, Black later filed a defamation suit against some directors in Canada. Id. at 1050-51.

After finally coming to a satisfactory deal with the Barclays, Black publicly disclosed the deal and repudiated the Restructuring Proposal. As part of the agreement with the Barclays,

---

[8] When confronted with the above actions by the Special Committee, the Delaware court found that Black lied about his conduct and intentionally mislead the Board.

11

Black agreed to use his best efforts to prevent International from selling the Telegraph or taking any actions to prevent the Barclays from taking control of the Telegraph. Id. at 1053. After learning of Black's double-dealing, the Board formed a Corporate Review Committee ("CRC"), composed of all the independent directors, which was given "broad authority to act for the company and to adopt such measures as a shareholder rights plan." Id. at 1054.

In response to the CRC, Black threatened to remove the Board and sue them and caused International's bylaws to be amended ("the Bylaw Amendments"). Id. at 1050-54. The "Bylaw Amendments fundamentally altered the power that the International independent directors possessed" and in effect allowed Black to "unilaterally block any material sale of assets, the board from adopting a shareholder rights plan, and prevent the signing of a merger agreement." Id. at 1055. The independent directors, however, refused to follow the Bylaw Amendments and adopted the Rights Plan. Id. at 1056. Ultimately, International brought the Delaware action seeking: (1) an injunction preventing Black from selling Inc. to the Barclays; (2) a declaration that the Bylaw Amendments are ineffective; and (3) a determination that the Rights Plan is valid.

After reviewing the evidence, the Delaware court found that Black violated his fiduciary duty of loyalty and the Restructuring Proposal and Strategic Process by: (1) misleading the board and attempting to usurp a corporate opportunity for his own benefit at the expense of the other shareholders; and (2) failing to pay back the non-compete payments. Id. at 1061-65. Accordingly, the court enjoined Black from proceeding with the sale to the Barclays and found that the Rights Plan was legally enacted but that the Bylaw Amendments were improper. Id.

## III. The Necessity of the Special Monitor Provision of the Consent Judgment

Having determined that the Consent Judgment did not violate Delaware law, this Court now turns to whether the provision appointing a Special Monitor is justified by the facts. As explained above, Section IV of the Consent Judgment calls for the appointment of a "Special Monitor," with a mandate "to protect the interests of the non-controlling shareholders," in the event of certain "Triggering Events." Inc. contends that the SEC and International have failed to show that there is an "imminent and material threat to the Special Committee," which would warrant the impediments which Section IV puts on Inc.'s voting rights. The SEC and International do not contest that Section IV will put some "incidental impediments" on Inc.'s voting rights, but contend that such impediments are justified based on the conduct of Black and the threat that he still poses to International's non-controlling shareholders.

In actions involving federal securities law violations and corporate mismanagement and fraud, federal courts have the power to appoint a receiver where necessary to protect the minority shareholders from the majority shareholders, who had defrauded and mismanaged the company but are still in control. See SEC v. Keller Corp., 323 F.2d 397, 403 (7th Cir. 1963)(finding appointment of a receiver proper because "[i]t is hardly conceivable that the trial court should have permitted those who were enjoined from fraudulent misconduct to continue in control of [the company's] affairs for the benefit of those shown to have been defrauded"); SEC v. Bowler, 427 F.2d 190, 197-98 (4th Cir. 1970)(holding that the appointment of a receiver was proper where necessary to protect the minority shareholders from the majority shareholders, who had defrauded and mismanaged the company but were still in control).

13

Here, based on the factual findings in the Delaware Decision, this Court concludes that any "incidental impediments" on Inc.'s voting rights are justified to protect the non-controlling shareholders from Black. As the Delaware court found, Black has "persistently and seriously" breached his fiduciary duties and his conduct "threatens grave injury to International and its stockholders." As explained above, since 1999, Black has gone to great lengths to use his control of International for his own benefit at the expense of the non-controlling shareholders. In addition to converting corporate assets and attempting to usurp corporate opportunities, Black has used deceit and threats to derail the Special Committee's investigation into his wrongdoing. Moreover, despite promising to repay the improper non-compete payments, neither Black nor Inc. have repaid any of the misappropriated funds. Accordingly, this Court finds that any impediments on Inc.'s voting rights by the appointment of the Special Monitor are justified based on the conduct of Black and the threat that he still poses to International's non-controlling shareholders.

## CONCLUSION

For the reasons discussed, this Court vacates the section of March Order granting the motion to vacate and DENIES Intervenor Hollinger Inc.'s motion to vacate the Consent Judgment. It is so ordered.

ENTER:

*Blanche M. Manning*
**BLANCHE M. MANNING**
**U.S. DISTRICT COURT JUDGE**

DATE: MAY 17 2004